**IN THE UNITED STATES DISTRICT COURT FOR THE** RECEIVED
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

2006 SEP -1 A 10: 10

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| CALVIN FLUKER, RICARDO WRIGHT, BERYL JACKSON, TRACEY MARTIN, LISA PITCHFORD, KIMBERLEY LOVE, | ) ) ) ) ) ) | CIVIL ACTION NO.: 2:06 cv 785 -MHT |
| PLAINTIFFS, | ) ) | JURY DEMAND |
| V. | ) ) | |
| U.S. FOODSERVICE, INC. and U.S. FOODSERVICE, INC. - MONTGOMERY DIVISION, | ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

**I.    JURISDICTION**

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, §

1343(4) and 28 U.S.C. Sections 2201 and 2202. This action is brought to secure the

protection of and to redress the deprivation of rights secured by 42 U.S.C. Section

1981 and Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et*

*seq.*, as amended by the Civil Rights Act of 1991 including 42 U.S.C. § 1981a, which

provide for injunctive and other relief against unlawful discrimination and retaliation in

employment.

## II.   PARTIES

2.      The plaintiff, Calvin Fluker, is an African-American male, a citizen of the United States, and a resident of the State of Alabama. The plaintiff Fluker has been employed by the Defendants since September 1, 1997.

3.      The plaintiff, Ricardo Wright, is an African-American male, a citizen of the United States, and a resident of the State of Alabama. The plaintiff Wright has been employed by the Defendants since September 1, 1997.

4.      The plaintiff, Tracey Martin, is an African-American female, a citizen of the United States, and a resident of the State of Alabama. The plaintiff Martin has been employed by the Defendants since August 1997.

5.      The plaintiff, Kimberley Love, is an African-American female, a citizen of the United States, and a resident of the State of Alabama. The plaintiff Love has been employed by the Defendants since July 2000.

6.      The plaintiff, Beryl Jackson, is an African-American female, a citizen of the United States, and a resident of the State of Alabama. The plaintiff Jackson has been employed by the Defendants since January 29, 1990.

7.      The plaintiff, Lisa Pitchford, is an African-American female, a citizen of the United States, and a resident of the State of Alabama. The plaintiff Pitchford has been employed by the Defendants since June 1998.

8.    The Defendant, U.S. Foodservice, Inc., is an entity subject to suit under Title VII and 42 U.S.C. § 1981. U.S. Foodservice, Inc. is authorized to conduct business in the State of Alabama and has a facility in Montgomery County, Alabama.

9.    The Defendant, U.S. Foodservice, Inc. - Montgomery Division, is an entity subject to suit under Title VII and 42 U.S.C. § 1981. U.S. Foodservice, Inc. - Montgomery Division is authorized to conduct business in the State of Alabama and has a facility in Montgomery County, Alabama.

### III.    Exhaustion of Administrative Remedies

10.    Plaintiff Fluker filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about May 6, 2004 and October 8, 2004. The EEOC issued a right to sue letter on July 18, 2006.

11.    Plaintiff Wright filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about June 23, 2004 and a Supplemental Charge on September 27, 2004. The EEOC issued a right to sue letter on June 5, 2006.

12.    Plaintiff Martin filed a Charge of Discrimination on February 27, 2005 and a Supplemental Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about February 24, 2006. The EEOC issued a right to sue letter on June 13, 2006.

3

13.    Plaintiff Love filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about March 27, 2005. The EEOC issued a right to sue letter on June 13, 2006.

14.    Plaintiff Jackson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about March 2, 2005. The EEOC issued a right to sue letter on June 12, 2006.

15.    Plaintiff Pitchford filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about February 20, 2005. The EEOC issued a right to sue letter on June 12, 2006.

16.    The Equal Employment Opportunity Commission conducted an independent investigation into the employment practices of the Defendants company.  On September 14, 2005, the EEOC issued a determination following its investigation into the charge filed by employee Calvin Fluker. The EEOC determined "Evidence obtained during the investigation revealed that Charging Party [Fluker] and a class of Blacks have been subjected to racial harassment." The EEOC further "determined there is reasonable cause to believe the Respondent discriminated against Charging Party and Blacks as a class by subjecting them to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended" and that "the Charging Party and Blacks as a class have been retaliated against after they complained of racial harassment."

4

## IV.    Facts

### Facts Pertaining to Calvin Fluker

17.    Calvin Fluker was hired by U.S. Foodservice on or about June 26, 1996.  Mr. Fluker is a National Account Executive for the company.

18.    During his employment with the Defendants, Fluker has been subjected to a racially hostile work environment.  For example, in 2004, Danny Mimms, who had been previously warned about making racial slurs to another African-American employee, called Fluker a "goddamn nigger" on a company voice mail.  On information and belief, Danny Mimms received a prior warning in 2001 about using racial slurs at work.  On another occasion, Mims asked Fluker if his nickname was "Toby" in clear reference to the book "Roots."   A short time after his second documented incident of making  racial slurs, Danny Mimms was recognized as "Territory Manager of the Year" at a company-wide awards banquet.

19.    Employee Craig Bruce, a sales trainee, also referred to Fluker as a "nigger." Bruce called Fluker "nigger" in front of another employee.  Bruce was terminated several days later, but before Bruce's termination, Fluker was approached by his supervisor, Kevin Egan, who offered to pay Fluker money if Bruce could be allowed to keep his job.  Fluker turned down the offer of money.  Later that same day, Egan again asked Fluker if he would accept a pay raise.  Fluker declined.

20.    Further, Kevin Egan on many occasions referred to Fluker as "Mandingo." In addition, Julian Alford, another management employee, referred to Fluker as "Kunta Kenta," on several occasions, another clear reference to the book "Roots" and to the slavery of African Americans. Fluker informed Egan and Alford that he found these names offensive to him. On another occasion, co-employee Phyllis Jones referred to Brazil nuts as "nigger toes" in Fluker's presence during a company sponsored function. Egan also made the statement to Fluker that he was told by the President of the division that if he did not advance in the company, he would know why or words to that effect. Egan made this statement at a reception in which Fluker had spoken to a young, white female.

21.    On or about December 4, 2002, Dale Ward, a white male, retired from U.S. Foodservice. Ward was a salesman for the company in the Evergreen, Alabama area. Fluker's hometown is Evergreen, Alabama. Fluker asked Joe Chambliss, Vice President of Sales, about the position but Chambliss informed Fluker that people in that area "were not ready" for Fluker to be a sales representative. Fluker was told the area "wouldn't be a good fit." A less qualified white representative was hired to work in the area, and parts of the territory were broken up and divided among two other white sales representatives.

22.    The Defendants company also has had a policy of not posting certain job opportunities within the company. Numerous white males have been hired to fill

6

positions which were not posted including Phillip Romeii (District Manager), Steve Hansen, Todd Hansen, Joey Morris, Craig Bruce (National Account Executive), and Charles Patroni.   Fluker was qualified for all of these positions and would have accepted any of these positions.

23.    After Fluker filed a charge of discrimination with the EEOC, U.S. Foodservice retaliated against him.  Fluker was isolated and ignored by his supervisors and co-workers, disciplined unfairly, excluded from sales meetings in which Fluker normally participated, excluded from assignments, and physically threatened.  Joe Chambliss also actively recruited three sales trainees to document any comment made by Fluker that could be construed as racial or sexual.  The company has also retaliated against Fluker by placing him on a Performance Improvement Plan in or around April 2006.

24.    Further, the Defendants company began retaliating against other employees by conducting individual interrogations of employees listed as witnesses by Fluker and other African American employees who filed charges of discrimination with the EEOC. The Defendants company attempted to coerce African American employees into signing statements that they had not been subjected to racial discrimination.

25.  Also, there is currently a District Manager position available in District 2 which has not been filled.   Fluker has expressed an interest in promotions to management positions;  however, the Defendants are actively seeking to fill the position with an

African American person who has not filed a charge of discrimination or otherwise opposed unlawful discrimination.

Facts Pertaining to Ricardo Wright

27.   Ricardo Wright was hired by the Defendants around September 1, 1997 as a Sales Trainee.

28.   On or around November 1, 1998, the plaintiff was promoted from Sales Trainee to the position of salaried Territory Manager, which is a sales position within the Defendants company. Since plaintiff was hired in 1997, no other African-American Territory Managers have been hired in the Birmingham District while many white Territory Managers have been hired. Of the approximately 115 sales representatives employed by the Defendants in Alabama, very few are African-American.

29.   On or around January 22, 1999, plaintiff expressed his interest in becoming a member of management within the Defendants company. Prior to joining the Defendants, plaintiff had management experience.

30.   On June 1, 2000, Wright moved from a salaried Territory Manager to Territory Manager compensated solely by sales commissions.

31.   Wright was forced to change to full commission without a transition period. Other Territory Managers, who are white, were paid a salary during a lengthy transition period to a full commission Territory Manager.

32.     As a Territory Manager, Wright has been assigned to primarily lower income African-American areas in metropolitan Birmingham, Alabama. Wright's territory has been largely limited to western Birmingham. The Defendants have asserted that it assigned those areas to Wright because those areas would be "a perfect fit" for him. Although Wright is assigned to accounts in western Birmingham, large and lucrative accounts in the western Birmingham area such as, Visionland amusement park, Miles College, and a high volume restaurant in Fairfield, were assigned to white sales representatives.

33.     White sales representatives with less experience and less seniority have been awarded more lucrative sales territories with much greater income potential than the lower income areas assigned to Wright. In some instances, new white representatives with no prior sales experience have been assigned more lucrative accounts and/or territories.

34.     Plaintiff is not routinely permitted to set his own prices on products which makes it more difficult for him to make sales and earn commissions. Plaintiff's white counterparts are often permitted to offer certain product discounts.

35.     The Defendants adjust commissions based on account collections. Territory Managers, including Wright, with certain percentages of their accounts past due are assessed a monetary penalty. However, some white Territory Managers have been exempted from penalties for unpaid balances and have not had their clients' accounts

9

placed on a C.O.D. or "no ship" status despite large amounts of seriously delinquent accounts. In addition, Wright has been subjected to greater scrutiny and discipline for poor collections when compared to his white counterparts.

36.    Plaintiff is also not given the same level of support as his white counterparts. For example, white Territory Managers are given more support in collecting delinquent accounts. White Territory Managers often have their clients called on by members of senior management whereas sales calls on Wright's accounts by senior management are extremely rare.

37.    Wright's African-American clients have been given less desirable credit terms and less flexibility than the clients of plaintiff's white counterparts, resulting in reduced sales and commissions for Wright.

38.    Wright's African-American clients often have received poor customer service from the Defendants in the form of missed shipments, late shipments, and shipments of defective product, which has resulted in reduced sales and commissions for Wright. When Wright's clients have discussed their concerns with Wright's managers, their complaints have often been ignored and these clients have been told to "find another supplier." This treatment is in contrast to the better quality customer service provided by the Defendants to clients in higher income, predominantly white areas where managers will personally call on accounts when there are product quality concerns or other customer service concerns.

39.    Wright has also been denied the opportunity to advance to the position of District Sales Manager. Until approximately November 2005, Defendants filled these positions without posting the vacancies. In November 2005, Wright was given the opportunity to interview for the District Manager position; however, the company hired a less qualified, white male to fill the position.

40.    Prior to filing a Charge of Discrimination with the EEOC, Wright made his concerns known to his supervisors both verbally and in writing. Wright explicitly raised complaints that he was being discriminated against by the Defendants because of his race. Defendants took no steps to address Wright's complaints of discrimination.

41.    On or around September 27, 2004, Wright filed a charge of discrimination with the EEOC.

42.    In the first 5 months after Wright filed a Charge of Discrimination, Wright received almost no commission "recap" reports making Wright's job much more difficult. Also, many invoices were "lost" on his accounts that are C.O.D. which has resulted in delayed payment to Wright and penalties for delinquent accounts.

43.    Also, there is currently a District Manager position available in District 2 which has not been filled. Wright expressed his interest in the position, but Wright was informed the position will not be filled. However, the Defendants are actively seeking

11

to fill the position with an African American person who has not filed a charge of discrimination or otherwise opposed unlawful discrimination.

Facts Pertaining to Beryl Jackson

44.    Beryl Jackson was hired by the Defendants around January 29, 1990 and was promoted to Territory Manager in July 1997.

45.    Jackson was not assigned a territory upon her promotion to salaried Territory Manager unlike many new white Territory Managers. Also, Jackson was not provided a "step down transition" to transition from a salaried Territory Manager to a full commissioned Territory Manager whereas many white employees have received a salary during the transition to full commission.

46.    Jackson has many accounts that are compensated at a 1% commission structure rather than U.S. Foodservice's standard 30% commission of landed profits. On information and belief, many white Territory Managers receive a 3% commission on accounts that U.S. Foodservice labels as 1% accounts.

47.    Jackson was denied the opportunity to work in two lucrative sales territories allegedly because those territories were not a "perfect fit." Less experienced and less qualified white and male Territory Managers were assigned these more lucrative sales territories.

48.    Moreover, the Defendants do not equally distribute sales leads to its sales representatives. White sales representatives are routinely given leads with higher

12

volume sales and black representatives, including Jackson, are often given leads with lower sales volumes.

49.    For example, Jackson was assigned the John Knox Manor account. This account was assigned to Jackson after the company lost the account. Jackson began cold calling the account and was able to get most of the business back for U.S. Foodservice. Subsequently, a person at John Knox Manor (Kathy Crittenden, white female) wrote to U.S. Foodservice and requested that the account be assigned to another Territory Manager, Elizabeth Cronic (white female). The account was eventually transferred to Cronic with Jackson receiving only 1% of sales for 1 year. The Defendants company did not support Jackson and actively work to keep her on the account.

50.    In contrast to how U.S. Foodservice handled the John Knox Manor account, on at least two occasions, an account requested Jackson as Territory Manager and Jackson was never even told about the requests. The Defendants actively sought to maintain the account for the current white Territory Managers and was successful in keeping the account with the white Territory Managers.

51.    Plaintiff is also not given the same level of support as her white counterparts. For example, white Territory Managers are given more support in collecting delinquent accounts.  Also, white Territory Managers often have their clients called on by

13

members of senior management whereas sales calls on Wright's accounts by senior management are extremely rare.

52.   Jackson's African-American clients have been given less desirable credit terms and less flexibility than the clients of plaintiff's white counterparts, resulting in reduced sales and commissions for Jackson.

53.   Jackson's African-American clients often have received poor customer service from the Defendants in the form of missed shipments, late shipments, and shipments of defective product, which has resulted in reduced sales and commissions for Jackson. This treatment is in contrast to high quality customer service provided by the Defendants to clients in higher income, predominantly white areas where managers will personally call on accounts when there are product quality concerns or other customer service concerns.

54.   Jackson has been denied District Sales Manager positions that have been filled by less qualified whites. These highly compensated positions are normally filled with white candidates without an open application process.

55.   Also, there is currently a District Sales Manager position available in District 2 which has not been filled. Jackson expressed her interest in the position, but Jackson was informed the position will not be filled. However, the Defendants are actively seeking to fill the position with an African American male who has not filed a charge of discrimination or otherwise opposed unlawful discrimination. Further, the

Defendants selected Willie Walker to serve as a mentor which resulted in an increase of pay despite Jackson's much longer tenure with the Defendants.

Facts Pertaining to Lisa Pitchford

56.    The plaintiff Pitchford began working for the Defendants in June 1998 as a bookkeeper.

57.    During her employment, Pitchford has sought promotions to the positions of payroll clerk, credit clerk, credit manager, other positions in the credit department, and sales positions. Each time, less qualified white candidates were selected. Pitchford finally received a job as Sales Trainee in July 2005 after she filed an EEOC charge.

58.    As a sales trainee, Pitchford has been forced to spend much more time covering for sick or absent Territory Managers as compared to white sales trainees, making it much more difficult for Pitchford to cultivate her own accounts. The Defendants have also provided Pitchford inferior leads and leads in lower income neighborhoods while white sales trainees have been assigned lucrative accounts and/or stronger leads. The Defendants have also provided lower quality service and delayed deliveries to Pitchford's accounts and the Defendants are more restrictive in granting credit terms to Pitchford's accounts when compared to similar accounts of white sales representatives. Defendants have also provided less support for Pitchford when an account has a problem than for her white counterparts. All these actions have reduced Pitchford's compensation.

15

59.    In addition, after Pitchford's name was mentioned in an EEOC investigation, the

Defendants began retaliating against her by unfairly disciplining her, and by excluding

her from necessary meetings that previously included Pitchford.

Facts Pertaining to Kimberley Love

60.    Kimberley Love began working for the Defendants in July 2000 as a credit

assistant and is still in that job today.

61.    Because the Defendants company only recently started posting some vacancies,

Love has often been unable to apply for positions in sales and other higher paying

positions. Love has often been denied the opportunity to apply for a Territory

Manager position because the Defendants company did not post such positions.

62.    Love has never been offered a promotion within the Defendants company. The

Defendants company once offered to pay Love an additional $ 0.75 per hour if she

would take on the additional responsibilities of collecting some debts. On information

and belief, the Defendants company made an identical offer to a white female co-

worker except that she was offered a larger per hour increase than Love was offered.

63.    Love has also been denied certain training given to white employees. For

example, Love has not been permitted to have tax training despite repeated requests

for such training. This training is highly relevant to Love's current position.

64.    In 2005, after Love filed her EEOC charge, the position of credit manager was

posted, but the posting required a four year degree. Because Love only had

completed 3.5 years of college, she did not apply. However, when the vacancy was sent to the State of Alabama for posting, the VP of Finance, David Watts, instructed Gwen Thomas in Human Resources to remove the college degree requirement. Al Sartain (white male) was hired to fill that position.

65.    Love was and still is being discriminated against in job assignments. For example, Love is not allowed to handle COD Check approvals, but a less qualified white female, Betty Clayton, is allowed to do that task. Experience in handling COD check approvals would assist Love's movement into a credit manager position or higher position.

66.    In approximately October 2005, Love applied for the position of credit manager. Rather than promoting Love, the company hired Charles Wallace, a white male who had to move from Florida, to fill the position over the plaintiff.

Facts Pertaining to Tracey Martin

67.    Martin began working for the respondent in August of 1997 as an Accounting Clerk.

68.    Martin has constantly sought promotions to higher paying positions, and the Defendants company has consistently selected less qualified whites and males over Martin. For example, on September 20, 2004, the Defendants company selected a white male named Greg Hueber over Martin for an Assistant Controller position. The

17

reasons the Defendants company did not select Martin were pretextual. Mr. Huebner
was a new hire.

69.    Martin also applied for a Credit Manager position. The Defendants company
again gave pretextual reasons for not promoting Martin. Upon information and belief,
the respondent had already selected a less qualified white female when the position was
posted.

70.    When Martin expressed an interest in a sales position, Martin was told that
position was "not a good fit" for her.   The vast majority of these positions are held
by white males.

71.    In August 2005, Martin applied for a position as an Accounts Receivable
Manager.  On approximately October 4, 2005, Martin learned that the Accounts
Receivable Manager position was awarded to a less qualified white female.   Martin
was informed that she was not awarded the Accounts Receivable Manager position
because Martin was over-qualified for the position. Rather than award Martin the
Accounts Receivable Manager position, which included supervisory responsibilities
and a higher salary than Martin earns, the Defendants company created a new position,
Staff Accountant II, for her.   Martin accepted the new position based on
representations that have not materialized.

72.    As a Staff Accountant II, Martin has no supervisory responsibilities, and Martin
performs much of the same work that she performed in her prior position. Martin also

has to seek out job duties and assignments. Apparently, the position was created as the result of Martin's filing an EEOC charge.

73.    Further, since Martin received the Staff Accountant II position, the Controller, Shelby Pierce, constantly monitors Martin's every move, while she does not treat white employees or employees who have not previously filed an EEOC charge in the same manner.

## IV.    CAUSES OF ACTION

### A.    COUNT I — RACE AND/OR GENDER DISCRIMINATION

74.    The plaintiffs re-allege and incorporate by reference paragraphs 1-73 above with the same force and effect as if fully set out in specific detail hereinbelow.

75.    During their employment, the Defendants discriminated against the plaintiffs because of their African-American race and/or gender in compensation, job selections, promotions, job assignments, transfers, discipline, training, segregated location assignments, and other terms, conditions and privileges of their employment.

76.    The Defendants articulated reasons for these actions are pretextual and not legitimate.

77.    The defendants engage in a pattern and practice of race and gender discrimination and each of the plaintiffs have been adversely affected by the practice.

78.   Each of the plaintiffs have been deprived of an opportunity to work in an integrated work environment in which African American and female employees hold managerial and other essential positions.

79.   In addition to the defendants' intentional discriminatory practices, the defendants also utilize a battery of practices, including its job selection and wage determination practices, that disparately impact the employment opportunities of African Americans and females.

80.   The defendants adhere to a policy and practice of restricting African Americans' and females' employment opportunities to lower classification and compensation levels. The defendants bar African American and female employees from management and other traditionally white and male classifications and compensation levels. The systemic means of accomplishing such race and sex discrimination include, but are not limited to, the defendants' selection procedures and unequal terms and conditions and privileges of employment.

81.   Said race and/or sex discrimination was done maliciously, willfully, and with reckless disregard for the rights of the plaintiffs.

82.   The plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is his only means of securing adequate relief.

83.    The plaintiffs are now suffering, and will continue to suffer irreparable injury from Defendants unlawful conduct as set forth herein unless enjoined by this Court.

## B.    COUNT II — RACE DISCRIMINATION - HOSTILE WORK ENVIRONMENT

84.    The plaintiffs re-allege and incorporate by reference paragraphs 1-79 above with the same force and effect as if fully set out in specific detail hereinbelow.

85.    During his employment, Calvin Fluker was subjected to a racially hostile work environment.

86.    The Defendants were aware of this hostile and abusive environment and refused to take appropriate remedial action.

87.    The Defendants ratified and/or condoned such hostile and abusive behavior by failing to take appropriate remedial action.

88.    The Defendants are vicariously liable for the conduct of the employees and supervisors that harassed the plaintiff.

89.    Said racial harassment was done maliciously, willfully, and with reckless disregard for the rights of the plaintiff.

90.    Plaintiff Fluker has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is his only means of securing adequate relief.

91.    The plaintiff is now suffering, and will continue to suffer irreparable injury from Defendants unlawful conduct as set forth herein unless enjoined by this Court.

## C.    COUNT III - RETALIATION

92.    The plaintiffs re-allege and incorporate by reference paragraphs 1-87 above with the same force and effect as if fully set out in specific detail hereinbelow

93.    The plaintiffs have opposed the Defendants discriminatory practices by filing EEOC charges and making other complaints of race and/or sex discrimination.

94.    In response to the plaintiffs opposing discrimination and engaging in protected activity, the Defendants retaliated against the plaintiffs in compensation, promotions, job assignments, discipline, training, and other terms, conditions and privileges of employment.

95.    A reasonable person would have found the Defendants' retaliatory actions to be materially adverse and such actions might have dissuaded a reasonable employee from making or supporting a charge of race and/or sex discrimination.

96.    Said retaliation was done maliciously, willfully, and with reckless disregard for the rights of the plaintiffs.

97.    The plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is his only means of securing adequate relief.

98.    The plaintiffs are now suffering, and will continue to suffer irreparable injury from the Defendants unlawful conduct as set forth herein unless enjoined by this Court.

## V.    PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray that this Court assume jurisdiction of this action and after trial:

1.    Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the Defendants violate the rights of the plaintiffs secured by Title VII as amended and/or Section 1981.

2.    Grant the plaintiffs a permanent injunction enjoining the Defendants, its agents, successors, employees, attorneys and those acting in concert with the Defendants and at the Defendants request from continuing to violate Title VII and/or 42 U.S.C. § 1981.

3.    Enter an Order requiring the Defendants to make the plaintiffs whole by awarding them the positions they would have occupied in the absence of race and/or sex discrimination and retaliation, front pay, back-pay (plus interest), nominal damages, lost seniority, benefits, loss of pension, compensatory and punitive damages, and pre and post judgment interest.

4.    The plaintiffs further pray for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses.

23

## PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY

Respectfully submitted,

Jon C. Goldfarb (GOL015)
Maury S. Weiner (WEI021)
Ethan R. Dettling (DET001)
Counsel for Plaintiff

**OF COUNSEL:**
Wiggins, Childs, Quinn & Pantazis, LLC
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

**DEFENDANTS' ADDRESS FOR SERVICE:**

U.S. Foodservice, Inc.
c/o CSC LAWYERS INCORPORATING SERVICE, INC
150 South Perry Street
Montgomery, Alabama 36104-4227