**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RICARDO WRIGHT, BERYL** | ) | |
| **JACKSON, TRACEY MARTIN,** | ) | |
| **CALVIN FLUKER, LISA** | ) | |
| **PITCHFORD, KIMBERLY LOVE,** | ) | **CIVIL ACTION NO.:** |
| **RESHANDA BROWN,** | ) | **2:06cv785-MHT** |
| | ) | |
| **PLAINTIFFS,** | ) | **JURY DEMAND** |
| | ) | |
| **V.** | ) | |
| | ) | |
| **U.S. FOODSERVICE, INC., and** | ) | |
| **U.S. FOODSERVICE, INC. -** | ) | |
| **MONTGOMERY DIVISION,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## SECOND AMENDED COMPLAINT

### I.    JURISDICTION

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, §

1343(4) and 28 U.S.C. Sections 2201 and 2202.  This action is brought to secure the

protection of and to redress the deprivation of rights secured by 42 U.S.C. Section

1981 and Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et*

*seq*., as amended by the Civil Rights Act of 1991, including 42 U.S.C. § 1981a, which

provide for injunctive and other relief against unlawful discrimination and retaliation

in employment.

## II.    PARTIES

2.      The plaintiff, Ricardo Wright, is an African-American male, a citizen of the United States, and a resident of the State of Alabama.  Wright has been employed by the defendant since September 1, 1997.

3.       The plaintiff, Tracey Martin, is an African-American female, a citizen of the United States, and a resident of the State of Alabama.   Martin has been employed by the defendant since August, 1997.

4.       The plaintiff, Kimberly Love, is an African-American female, a citizen of the United States, and a resident of the State of Alabama.   Love has been employed by the defendant since July, 2000.

5.      The plaintiff, Calvin Fluker, is an African-American male, a citizen of the United States, and a resident of the State of Alabama.   Fluker has been employed by the defendant since September 1, 1997.

6.      The plaintiff, Beryl Jackson, is an African-American female, a citizen of the United States, and a resident of the State of Alabama.   Jackson has been employed by the defendant since January 29, 1990.

7.      The plaintiff, Lisa Pitchford, is an African-American female, a citizen of the United States, and a resident of the State of Alabama.   Pitchford has been employed

2

by the defendant since June, 1998.

8.    The plaintiff, Reshanda Brown, is an African-American female, a citizen of the United States, and a resident of the State of Alabama.   Brown was employed by the defendant from October 31, 2005 to November 13, 2006.

9.    The Defendant, U.S. Foodservice, Inc., (hereinafter "defendant" or "U.S. Foodservice")  is an entity  subject to suit under Title VII and 42 U.S.C. § 1981. U.S. Foodservice, Inc. is authorized to conduct business in the State of Alabama and has a facility in Montgomery County, Alabama.

10.    The Defendant, U.S. Foodservice, Inc. - Montgomery Division (hereinafter "defendant" or "U.S. Foodservice") is an entity subject to suit under Title VII and 42 U.S.C. § 1981.  U.S. Foodservice, Inc. - Montgomery Division is authorized to conduct business in the State of Alabama and has a facility in Montgomery County, Alabama.

**III.    Exhaustion of Administrative Remedies**

11.    Plaintiff Wright filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about June 23, 2004 and a Supplemental Charge on September 27, 2004.  The EEOC issued a right to sue letter on June 5, 2006.

12.    Plaintiff Martin filed a Charge of Discrimination on February 27, 2005 and a

3

Supplemental Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about February 24, 2006. The EEOC issued a right to sue letter on June 13, 2006.

13.    Plaintiff Love filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about March 27, 2005. The EEOC issued a right to sue letter on June 13, 2006.

14.    Plaintiff Fluker filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about May 6, 2004. The EEOC issued a right to sue letter on July 18, 2006.

15.    Plaintiff Jackson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about March 2, 2005. The EEOC issued a right to sue letter on June 12, 2006.

16.    Plaintiff Pitchford filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on or about February 20, 2005. The EEOC issued a right to sue letter on June 12, 2006.

17.    The Equal Employment Opportunity Commission conducted an independent investigation into the employment practices of the Defendant company. On September 14, 2005, the EEOC issued a determination following its investigation into the charge filed by employee Calvin Fluker. The EEOC determined "Evidence

obtained during the investigation revealed that Charging Party [Fluker] and a class of Blacks have been subjected to racial harassment." The EEOC further "determined there is reasonable cause to believe the Respondent discriminated against Charging Party and Blacks as a class by subjecting them to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended" and that "the Charging Party and Blacks as a class have been retaliated against after they complained of racial harassment."

18.    Plaintiff Reshanda Brown brings her claims solely  pursuant to 42 U.S.C. § Section 1981.

## IV.    STATEMENT OF FACTS

### Facts Pertaining to Ricardo Wright

19.    Ricardo Wright was hired by the Defendant around September 1, 1997 as a Sales Trainee.

20.    On or around November 1, 1998, the plaintiff was promoted from Sales Trainee to the position of salaried Territory Manager, which is a sales position within the Defendant company. Since plaintiff was hired in 1997, no other African-American Territory Managers have been hired in the Birmingham District while many white Territory Managers have been hired. Of the approximately 115 sales representatives employed by the Defendant in Alabama, very few are African-American.

21.     On or around January 22, 1999, plaintiff expressed his interest in becoming a member of management within the Defendant company.   Prior to joining the Defendant, plaintiff had management experience.

22.     On June 1, 2000, Wright moved from a salaried Territory Manager to Territory Manager compensated solely by sales commissions.

23.     Wright was forced to change to full commission without a transition period. Other Territory Managers, who are white, were paid a salary during a lengthy transition period to a full commission Territory Manager.

24.     As a Territory Manager, Wright has been assigned to primarily lower income African-American areas in metropolitan Birmingham, Alabama.  Wright's territory has been largely limited to western Birmingham.  The Defendant has asserted that it assigned those areas to Wright because those areas would be "a perfect fit" for him. Although Wright is assigned to accounts in western Birmingham, large and lucrative accounts in the western Birmingham area, such as Visionland Amusement Park, Miles College, and a high volume restaurant in Fairfield, were assigned to white sales representatives.

25.     White sales representatives with less experience and less seniority have been awarded more lucrative sales territories with much greater income potential than the lower income areas assigned to Wright.  In some instances, new white representatives

with no prior sales experience have been assigned more lucrative accounts and/or territories.

26.    Plaintiff  is not routinely permitted to set his own prices on products which makes it more difficult for him to make sales and earn commissions.  Plaintiff's white counterparts are often permitted to offer certain product discounts.

27.    The Defendant adjusts commissions based on account collections.  Territory Managers, including Wright,  with certain percentages of their accounts past due are assessed a monetary penalty.  However, some white Territory Managers have been exempted from penalties for unpaid balances and have not had their clients' accounts placed on a C.O.D. or "no ship" status despite large amounts  of seriously delinquent accounts.  In addition, Wright has been subjected to greater scrutiny and discipline for poor collections when compared to his white counterparts.

28.    Plaintiff is also not given the same level of support as his white counterparts.  For example, white Territory Managers are given more support in collecting delinquent accounts.  White Territory Managers often have their clients called on by members of senior management whereas sales calls on Wright's accounts by senior management are extremely rare.

29.    Wright's African-American clients have been given less desirable credit terms and less flexibility than the clients of plaintiff's white counterparts, resulting in

reduced sales and commissions for Wright.

30.     Wright's African-American clients often have received poor customer service from the Defendant in the form of missed shipments, late shipments, and shipments of defective product, which has resulted in reduced sales and commissions for Wright.   When Wright's clients have discussed their concerns with Wright's managers, their complaints have often been ignored and  these clients have been told to "find another supplier."  This treatment is in contrast to the better quality customer service provided by the Defendant to clients in higher income, predominantly white areas where managers will personally call on accounts when there are product quality concerns or other customer service concerns.

31.     Wright has also been denied the opportunity to advance to the position of District Sales Manager.  Until approximately November 2005, Defendant filled these positions without posting the vacancies.  In November 2005, Wright was given the opportunity to interview for the District Manager position; however, the company hired a less qualified, white male to fill the position.

32.     Prior to filing a Charge of Discrimination with the EEOC, Wright made his concerns known to his supervisors both verbally and in writing.  Wright explicitly raised complaints that he was being discriminated against by the Defendant because of his race.   Defendant took no steps to address Wright's complaints of

discrimination.

33.    On or around September 27, 2004, Wright filed a charge of discrimination with the EEOC.

34.    In the first 5 months after Wright filed a Charge of Discrimination, Wright received almost no commission  "recap" reports making Wright's job much more difficult. Also, many invoices were "lost" on his accounts that are C.O.D., which has resulted in delayed payment to Wright and penalties for delinquent accounts.

35.    Also, there is currently a District Manager position available in District 2 which has not been filled.   Wright expressed his interest in the position, but Wright was informed the position will not be filled.  However, the Defendant is actively seeking to fill the position with an African American person who has not filed a charge of discrimination or otherwise opposed unlawful discrimination.

Facts Pertaining to Beryl Jackson

36.    Beryl Jackson  was hired by the Defendant around January 29, 1990, and was promoted to Territory Manager in July 1997.

37.    Jackson  was not assigned a territory upon her promotion to salaried Territory Manager unlike  many  new  white  Territory  Managers.   Also, Jackson  was  not provided a "step down transition" to transition from a salaried Territory Manager to a full commissioned Territory Manager whereas many white employees have received

a salary during the transition to full commission.

38.    Jackson has many health care and assisted living facility accounts that are compensated at a 1% commission structure, while certain white Territory Managers receive a 3% commission on the same type of accounts, including, but not limited to, Paul Dekle.

39.    Jackson was denied the opportunity to work in two lucrative sales territories, including Auburn, Alabama, which Todd Hanson received and Greenville, Alabama, which Angela Wood received, allegedly because those territories were not a "perfect fit." Both Hanson and Wood are less experienced and less qualified Territory Managers than Jackson, and they are both white.

40.    Moreover, the Defendant does not equally distribute sales leads to its sales representatives. White sales representatives are routinely given leads with higher volume sales and black representatives, including Jackson, are often given leads with lower sales volumes. Moreover, when Jackson lost substantial commissions from sales to her National Guard account because of the wars in Afghanistan and Iraq, the defendant did nothing to supplement Jackson's income. However, when white males have lost significant revenues due to special circumstances with accounts, such as Don Barranco and Mitch Ward, the defendant has paid them a salary to make up for the lost commissions.

41.    Jackson is assigned primarily leads in the predominately African-American sections of Montgomery, whereas her white co-workers, including, but not limited to, Mark Burke, Nolan Senn, and Calvin Prestige, are given the more lucrative leads in the predominately white sections of Montgomery. One specific example of this occurred when Jackson was assigned the John Knox Manor account. This account was assigned to Jackson after the company lost the account. Jackson began cold calling the account and was able to get most of the business back for U.S. Foodservice. Subsequently, a person at John Knox Manor (Kathy Crittenden, white female) wrote to U.S. Foodservice and requested that the account be assigned to another Territory Manager, Elizabeth Cronic (white female). The account was eventually transferred to Cronic with Jackson receiving only 1% of sales for 1 year. The Defendant company did not support Jackson and actively work to keep her on the account. However, when Danny Mimms, a white Territory Manager, was in danger of losing his account at Maxwell Air Force Base to Jackson because the customer had requested her, the Defendant took action to make sure Danny Mimms stayed on that account as opposed to Jackson.

42.    Plaintiff is also not given the same level of support as her white counterparts. For example, white Territory Managers are given more support in collecting delinquent accounts. Also, white Territory Managers often have their clients called

on by members of senior management whereas sales calls on Jackson's accounts by senior management are extremely rare.   For example, Todd Hanson, a white male, has had numerous delinquent accounts in the Auburn and Montgomery areas causing his accounts receivables (AR) to be low; however, he is allowed to ship product to these accounts generally without restrictions and receive commissions.  However, if Jackson's accounts are delinquent, the product is generally shipped only C.O.D., which often results in product being returned.

43.    Jackson's clients often have received poor customer service from the Defendant in the form of missed shipments, late shipments, and shipments of defective product, which has resulted in reduced sales and commissions for Jackson. This treatment is in contrast to high quality customer service provided by the Defendant to clients of white Territory Managers, which includes managerial employees, Julian Alford and Joe Chambliss, making personnel visits to the white Territory Managers' customers.

44.    Jackson has been denied District Sales Manager positions that have been filled by less qualified whites, including, but not limited to, Phillip Romeii and Scott Jackson.  Romeii was hired only months before he became a District Sales Manager and Jackson was hired by the Defendant in approximately 2003.  These highly compensated positions are normally filled with white candidates without an open

application process.

45.    Also, there is currently a District Sales Manager position available in District 2 which has not been filled.    Jackson expressed her interest in the position, but Jackson  was informed the position will not be filled.  However, the Defendant is actively seeking to fill the position with an African American male who has not filed a charge of discrimination or otherwise opposed unlawful discrimination.  Further, the Defendant selected Willie Walker, an African-American male who has not filed a charge of discrimination against the defendant,  to serve as a mentor which resulted in an increase of pay despite Jackson's  much longer tenure with the Defendant. Moreover, the defendant has denied Jackson promotional compensation such as Points of Focus points that have been provided to white and/or male employees and employees who have not opposed race and/or sex discrimination.

Facts Pertaining to Calvin Fluker

46.    Calvin Fluker was hired by U.S. Foodservice on or about June 26, 1996.  Mr. Fluker is a National Account Executive for the company.

47.    During his employment with the Defendant, Fluker has been subjected to a racially hostile work environment.   For example, in 2004, Danny Mimms, who had been previously warned about making racial slurs to another African-American employee, called Fluker a "goddamn nigger" on a company voice mail.   On

13

information and belief, Danny Mimms received a prior warning in 2001 about using racial slurs at work.  On another occasion,  Mimms asked Fluker if his nickname was "Toby" in clear reference to the book "Roots."   A short time after his second documented incident of making  racial slurs, Danny Mimms was recognized as "Territory Manager of the Year" at a company-wide awards banquet.

48.    Employee Craig Bruce, a sales trainee, also referred to Fluker as a "nigger." Bruce called Fluker "nigger" in front of another employee.  Bruce was terminated several days later, but before Bruce's termination, Fluker was approached by his supervisor, Kevin Egan, who offered to pay Fluker money if Bruce could be allowed to keep his job.  Fluker turned down the offer of money.  Later that same day, Egan again asked Fluker if he would accept a pay raise.  Fluker declined.

49.    Further, Kevin Egan on many occasions referred to Fluker as "Mandingo."  In addition, Julian Alford, another management employee,  referred to Fluker as "Kunta Kenta," on several occasions, another clear reference to the book "Roots" and to the slavery of African Americans.  Fluker informed Egan and Alford that he found these names offensive to him.   On another occasion, co-employee Phyllis Jones referred to Brazil nuts as "nigger toes" in Fluker's presence during a company sponsored function.  Egan also made the statement to Fluker that he was told by the President of the division that if he did not advance in the company, he would know why or

14

words to that effect. Egan made this statement at a reception in which Fluker had spoken to a young, white female.

50.    Moreover, Fluker has been discriminated against in job assignments and promotions. On or about May 29, 2000, Fluker learned that the Defendant had an opening for a Territory Manager in the Auburn, Alabama area. Ben McDavid, in human resources, asked Fluker if he was interested in the position and informed Fluker that relocation to Auburn, Alabama was a prerequisite to accepting this position. Fluker declined the position because he did not want to move to Auburn without help with relocation costs. Thereafter, Todd Hansen, a white male, was hired instead for the position on or about June 8, 2000 but Hansen did not move to Auburn. Instead, Hansen purchased a home in east Montgomery and works in the Auburn market.

51.    On or about December 4, 2002, Dale Ward, a white male, retired from U.S. Foodservice. Ward was a salesman for the company in the Evergreen, Alabama area. Fluker's hometown is Evergreen, Alabama. Fluker asked Joe Chambliss, Vice President of Sales, about the position but Chambliss informed Fluker that people in that area "were not ready" for Fluker to be a sales representative. Fluker was told the area "wouldn't be a good fit." A less qualified white representative was hired to work in the area, and parts of the territory were broken up and divided among two other

white sales representatives.

52.    The Defendant company also has had a policy of not posting certain job opportunities within the company.  Fluker has been denied Territory Manager in addition to the ones listed above that have not been posted.    Moreover, numerous white males have been hired to fill positions which were not posted including Phillip Romeii (District Manager), Steve Hansen, Todd Hansen, Craig Bruce (National Account Executive), and Charles Patroni.    Fluker was qualified for all of these positions and most likely would have accepted any of these positions.

53.    After Fluker filed a charge of discrimination with the EEOC, U.S. Foodservice retaliated against him.  Fluker was isolated and ignored by his supervisors and co-workers, disciplined unfairly, excluded from sales meetings in which Fluker normally participated, excluded from assignments, and physically threatened.  Joe Chambliss also actively recruited three sales trainees to document any comment made by Fluker that could be construed as racial or sexual.  The company has also retaliated against Fluker by placing him on a Performance Improvement Plan in or around April, 2006.

54.    Further, the Defendant began retaliating against other employees by conducting individual interrogations of employees listed as witnesses by Fluker and other African American employees who filed charges of discrimination with the EEOC.  The Defendant attempted to coerce African-American employees into signing statements

that they had not been subjected to racial discrimination.

55.   Also, there is currently a District Manager position available in District 2 which has not been filled.   Fluker has expressed an interest in promotions to management positions;  however, the Defendant is actively seeking to fill the position with an African-American person who has not filed a charge of discrimination or otherwise opposed unlawful discrimination.

Facts Pertaining to Lisa Pitchford

56.   The plaintiff Pitchford began working for the Defendant in June, 1998, as a bookkeeper.

57.   During her employment, Pitchford has sought promotions to the positions of payroll clerk, credit clerk, credit manager, other positions in the credit department, and sales positions, including Sales Trainee and Territory Manager.  Each time, less qualified white and/or male candidates were selected.  Pitchford finally received a job as Sales Trainee in July, 2005, after she filed an EEOC charge;  however, the defendant refuses to promote her to the higher paying position of Territory Manager.

58.   As a Sales Trainee, Pitchford has been forced to spend much more time covering for sick or absent Territory Managers as compared to white sales trainees, making it much more difficult for Pitchford to cultivate her own accounts.  The

17

Defendant has also provided Pitchford inferior leads and leads in lower income neighborhoods while white sales trainees have been assigned lucrative accounts and/or stronger leads. The Defendant has also provided lower quality service and delayed deliveries to Pitchford's accounts and the Defendant is more restrictive in granting credit terms to Pitchford's accounts when compared to similar accounts of white and/or male sales representatives. Defendant has also provided less support for Pitchford when an account has a problem than for her white and/or counterparts. All these actions have been taken by the defendant in order to prevent Pitchford from receiving a promotion to a commissioned Territory Manager.

59.     Also, when established territories become available they are awarded to whites and/or males or persons who have not opposed race and/or sex discrimination. For example, Todd Hansen and Terry Lay, white employees, were given established territories by the defendant. In addition, the defendant recently refused to assign Pitchford the territory of Calvin Prestige, at least on a temporary basis, although she had worked the territory successfully in the past.

60.     In addition, after Pitchford's name was mentioned in an EEOC investigation, the Defendant began retaliating against her by unfairly disciplining her, and by excluding her from necessary meetings that previously included Pitchford. Most importantly, however, the defendant has retaliated against Pitchford by denying her

a promotion to Territory Manager as described above.

Facts Pertaining to Kimberly Love

61.    Kimberly Love began working for the Defendant in July, 2000, as a credit assistant and is still in that job today; although, her job title has changed to credit coordinator.

62.    Because the Defendant company only recently started posting some vacancies, Love has often been unable to apply for positions in sales and other higher paying positions.  Love did inquire about the Territory Manager position, but she was told that she would have to accept a Customer Service Representative position prior to being considered for a Territory Manager position.  Love has often been denied the opportunity to apply for a Territory Manager position because the Defendant did not post such positions.

63.    Love has never been offered a promotion within the Defendant company.  The Defendant once offered to pay Love an additional $ 0.75 per hour if she would take on the additional responsibilities of collecting some debts.  On information and belief, the Defendant made an identical offer to a white female co-worker, Linda Hobbs, except that she was offered a larger per hour increase than Love was offered.

64.    Love has also been denied certain training given to white employees.  For example, Love has not been permitted to have tax training despite repeated requests

for such training. This training is highly relevant to Love's current position.

65.    In 2005, after Love filed her EEOC charge, the position of credit manager was posted, but the posting required a four year degree. Because Love only had completed 3.5 years of college, she did not apply. However, when the vacancy was sent to the State of Alabama for posting, the VP of Finance, David Watts, instructed Gwen Thomas in Human Resources to remove the college degree requirement. The position was not posted internally again, and Al Sartain (white male) was hired off the street to fill that position.

66.    Love was and still is being discriminated against in job assignments. For example, Love is not allowed to handle C.O.D. Check approvals, but a less qualified white female, Betty Clayton, is allowed to do that task. Experience in handling C.O.D. check approvals would assist Love's movement into a credit manager position or higher position.

67.    In approximately October 2005, Love applied for the position of credit manager. Rather than promoting Love, the company hired Charles Wallace, a white male who had to move from Florida, to fill the position over the plaintiff.

68.    In addition, Love has been retaliated against by her direct supervisor, Al Sartain, in that he has taken actions that have made her job more difficult to perform, including, but not limited to, failing to approve credit applications submitted by her,

picking on her, barking at her, and on occasions referring to her lawsuit in a derogatory manner.

Facts Pertaining to Tracey Martin

69.     Martin began working for the respondent in August of 1997 as an Accounting Clerk.

70.     Martin has constantly sought promotions to higher paying positions, and the Defendant has consistently selected less qualified whites and males over Martin.  For example, on September 20, 2004, the Defendant company selected a white male named Greg Hueber over Martin for an Assistant Controller position.  The reasons the Defendant company did not select Martin were pretextual.  Mr. Hueber was a new hire.

71.     Martin also applied for a Credit Manager position which was filled by Al Sartain.  The Defendant company again gave pretextual  reasons for not promoting Martin, specifically that she did not have Sarbanes Oxley knowledge.   Upon information and belief, the respondent had already selected a less qualified white male when the position was posted.

72.     When Martin expressed an interest in a sales position, Martin was told by Ken Kraft, former President of the Division, the position was "not a good fit" for her.  The vast majority of these positions are held by white males, and until recently those

positions were not posted.

73.    In August 2005, when she was an Accounting Clerk,  Martin applied for a position as an Accounts Receivable Manager.  On approximately October 4, 2005, Martin learned that the Accounts Receivable Manager position was awarded to a less qualified white female, Diane Bogard.    Martin was informed that she was not awarded the Accounts Receivable Manager position because Martin was over-qualified for the position.  Rather than award Martin the Accounts Receivable Manager position, which included supervisory responsibilities and a higher salary than Martin earns, the Defendant created a new position, Staff Accountant II, for her. Martin accepted the new position based on representations that have not materialized.


74.    As a Staff Accountant II, Martin has no supervisory responsibilities, and Martin performs much of the same work that she performed in her prior clerk position, along with being assigned numerous menial tasks.  Martin also has to seek out job duties and assignments.   Apparently, the position was created as the result of Martin's  filing an EEOC charge, and as the result, Martin has to often search for work to occupy her days.  The Staff Accountant II position is a "dead end" job that severely limits Martin's opportunities for advancement.

75.    Further, since Martin received the Staff Accountant II position, the Controller,

Shelby Pierce, constantly monitors Martin's every move, while she does not treat white employees or employees who have not previously filed an EEOC charge in the same manner.

Facts Pertaining to Reshanda Brown

76.   Plaintiff Brown began working for the Defendant on October 31, 2005, in the company's credit department.   Plaintiff was employed by the Defendant as a temporary employee through an employment agency, Walker Personnel, with the expectation that she would become a permanent employee of the Defendant after 90 days.

77.   Brown performed the essential functions of a credit analyst on a daily basis from October 31, 2005 until her last date of employment on November 13, 2006. During her employment, Brown was also trained on tasks generally performed by a credit coordinator.

78.   Brown's  daily job duties consisted primarily of calling on assigned accounts with past due balances, resolving any problem invoices, and collecting past due monies.

79.   Brown received no verbal or written discipline of any kind while employed by the defendant.

80.   After her initial 90 days of employment, Brown began inquiring about a

permanent position with the Defendant and was told that there were no open positions.

81.     On July 14, 2006, Brown sent an e-mail to Al Sartain, which plaintiff belies was also sent to Ben McDavid and David Watts, to again confirm her interest in a permanent position.

82.     Subsequently, the defendant decided to hire a permanent employee to fill a credit analyst position in the credit department.  This open position was first made available in the summer of 2006 to current permanent employees of the defendant, and Brown was told she could not apply at that time.

83.     Upon information and belief, no qualified inside candidates applied; therefore, the credit analyst vacancy was opened to outside applicants and Brown applied.

84.     Brown was interviewed by Credit Managers, Al Sartain and Charles Wallace, during September 2006.  The interview lasted approximately five minutes.  During this interview Brown was told by Sartain that the credit analyst position was being combined with a credit coordinator position and that one person would be hired instead of two persons.

85.     On November 13, 2006, Brown was informed that the Defendant hired a white female named Allison Eskew for the position, who began working that same day. Credit Manager Sartain told Brown that he was sorry to tell her that they had hired

someone else to fill the position and that they no longer needed her. Brown was told that she needed to collect her belongings and leave immediately. Brown had to leave that day so that Eskew would have a place to work. Brown had a proven track record of successfully performing the functions of a credit analyst with the Defendant, while Ms. Eskew was hired off the street and had to be trained by Kimberly Love to perform to duties that Brown already knew how to perform.

86.    In addition, the defendant discriminated against Brown by failing to hire her from her temporary position to a permanent position as quickly as the defendant has for white temporary employees, including Kelly Mathews, a white female. **IV.**

## CAUSES OF ACTION

### A.    COUNT I — RACE AND/OR GENDER DISCRIMINATION

87.    The plaintiffs re-allege and incorporate by reference paragraphs 1-86 above with the same force and effect as if fully set out in specific detail hereinbelow.

88.    During their employment, the Defendant discriminated against the plaintiffs because of their African-American race and/or gender in compensation, promotions, job assignments, discipline, training, hiring, and other terms, conditions and privileges of their employment.

89.    The Defendant's articulated reasons for these actions are not legitimate.

90.    Said race and/or sex discrimination was done maliciously, willfully, and with

reckless disregard for the rights of the plaintiffs.

91.    The plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is their only means of securing adequate relief.

92.    The plaintiffs are now suffering, and will continue to suffer irreparable injury from Defendant's unlawful conduct as set forth herein unless enjoined by this Court.

## B.    COUNT II — RACE DISCRIMINATION - HOSTILE WORK ENVIRONMENT

93.    The plaintiffs re-allege and incorporate by reference paragraphs 1-92 above with the same force and effect as if fully set out in specific detail hereinbelow.

94.    During the course of his employment, Calvin Fluker was continuously subjected to a racially hostile work environment.

95.    The Defendant was aware of this hostile and abusive environment and refused to take appropriate remedial action.

96.    The Defendant ratified and/or condoned such hostile and abusive behavior by failing to take appropriate remedial action.

97.    The Defendant is vicariously liable for the conduct of the employees and supervisors that harassed the plaintiff.

98.    Said racial harassment was done maliciously, willfully, and with reckless disregard for the rights of the plaintiff.

99.    Plaintiff Fluker has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is his only means of securing adequate relief.

100.   The plaintiff is now suffering, and will continue to suffer irreparable injury from Defendant's unlawful conduct as set forth herein unless enjoined by this Court.

### C.    COUNT III - RETALIATION

101.   The plaintiffs re-allege and incorporate by reference paragraphs 1-100 above with the  same force and effect as if fully set out in specific detail hereinbelow

102.   The plaintiffs have opposed the Defendant's discriminatory practices by filing EEOC charges and making other complaints of race and/or sex discrimination.

103.   In response to the plaintiffs opposing discrimination and engaging in protected activity, the Defendant retaliated against the plaintiffs in compensation,  promotions, job assignments, discipline, training, and other terms, conditions and privileges of employment.

104.   A reasonable person would have found the Defendant's discriminatory actions to be materially adverse and such actions might have dissuaded a reasonable

employee from making or supporting a charge of race and/or sex discrimination.

105.    Said retaliation was done maliciously, willfully, and with reckless disregard for the rights of the plaintiffs.

106.    The plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages are their only means of securing adequate relief.

107.    The plaintiffs are now suffering, and will continue to suffer irreparable injury from the Defendant's unlawful conduct as set forth herein unless enjoined by this Court.

## V.    PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray that this Court assume jurisdiction of this action and after trial:

1.    Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the Defendant violate the rights of the plaintiffs secured by Title VII, as amended, and/or 42 U.S.C. § 1981.

2.    Grant the plaintiffs a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate Title VII and/or 42 U.S.C. §

1981.

3.     Enter an Order requiring the Defendant to make the plaintiffs whole by awarding them the positions they would have occupied in the absence of race and/or sex discrimination and retaliation, front pay, back-pay (plus interest), nominal damages, lost seniority, benefits, loss of pension, compensatory and punitive damages, and pre and post judgment interest.

4.     The plaintiffs further pray for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses.

### PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY

Respectfully submitted,

 s/Maury S. Weiner
Jon C. Goldfarb (GOL015)
Maury S. Weiner (WEI021)
Ethan R. Dettling (DET001)
Counsel for Plaintiff

**OF COUNSEL:**
Wiggins, Childs, Quinn & Pantazis, LLC
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

### CERTIFICATE OF SERVICE

I hereby certify that I have filed a true and correct copy of the above and

foregoing document the Clerk of Court using the CM/ECF system which will electronically notify the following counsel of record:

Tammy L. Baker, Esq.
Tamula R. Yelling, Esq
CONSTANGY, BROOKS & SMITH LLC
One Federal Place, Suite 900
1819 Fifth Avenue North
Birmingham, Alabama 35203

on this the  1st day of  March , 2007.

           s/Maury S. Weiner
           OF COUNSEL